[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
After the defendant filed a cross complaint in this dissolution action, the plaintiff withdrew her complaint and was granted conciliation procedures under Gen. Stat. 46b-53. #107 and #108. CT Page 4942
The plaintiff, whose maiden name was Mary Paula Devlin and whose prior married blame was Mary Paula Richard, did the defendant married in Hartford on September 13, 1972. The parties have recorded in Connecticut for more than one year preceding the complaint.
Elizabeth Cooley, born March 19, 1975, lawful issue of this marriage, is the only children to the plaintiff since her marriage.
The prior marriage of each party ended in divorced. The defendant has three adult sons from the prior marriage which ended in 1972; he pays $7800 annually for alimony. The three sons eventually shifted residence from their natural mother to the parties for respective periods of 3, 5 and 2 years beginning in 1974. The plaintiff undertook an active role in the development of defendants' sons; she was not only a step mother but a surrogate mother.
Based on her understanding of the child's request, the plaintiff objects to joint custody.
The defendant has been paying pendente lite $525 a week as child support and $325 a week on alimony or $850 total.
 I.
The defendant graduated from Yale and from Wharton in 1961 with an MBA. The parties met when they were both employed by the same brokerage firm and eventually developed a relationship which led to cohabitation and marriage. The defendant shifted to another stock broker firm until he became a bank trust officer and vice president for investments. In August 1982 with his wife's support he undertook this present position. When he left the bank he earned about $39,000; his first few years thereafter were salaried at about $258,000, to $25,000. He had significant trust income to cushion the income loss. Although since 1986 he has been basically an independent contractor/salesman receiving a commission, he had expectations of an equity position. He is a chartered financial analyst. The defendant testified his income is at jeopardy in the present financial climate even though he works 50 hours per week. He estimates a low $20,000 income for 1990.
Because of the pregnancy, in 1974 the plaintiff stopped employment. During the marriage she took various courts in financial management at local educational institutions and earned a M.A. in pastoral ministry (counselling) from St. Joseph College. The plaintiff initiated a local chapter of The Samaritan, Inc. in 1985. By then, however, the marriage was in CT Page 4943 difficulty.
In 1988 she earned $100 per week as a part time assistant photographer. The plaintiff has been employed as a personal financial planner since August 1989; she also is now an independent contractor/sales person who receives a commission when she plans or sells various financial products. She expects her income to reach $20,000 in a few years when she has built a client case; and thereafter between $30,000 and 40,000.
An employment expert concluded in June that the plaintiff had better job opportunities with the State of Connecticut ($27,500) or various non profits ($40,000); on the other hand, that expert testified that defendant could earn $40,000 and could even be involved at a corporate level at over $100,000. The court is not convinced.
While the court can base financial awards on earning capacity rather than actual earned income, the court cannot find that the defendant's change of employment in 1982 was made to deprive plaintiff of financial support. Paddock v. Paddock,22 Conn. App. 367, 371, ___ A.2d ___ (1990).
During his first marriage the defendant has a drinking problem which also surfaces in this marriage about 1975. Alcoholism became a significant factor which eventually doomed the marriage. She was a passive alcoholic who maintains employment, his illness transformer him into a distant family figure. After a confrontation with his children and the plaintiff in December 1981, the plaintiff stopped drinking and joined Alcoholics Anonymous (hereinafter AA) in June 1982, but then a different problem arose from his prospective: He believes that during his alcoholic period the plaintiff assumed a dominant role in the marital and parental relationship and was unable to accept him as an equal partner when he became sober in 1982.
The parties could not agree on therapists nor about Al-Anon nor about alcoholism. The plaintiff initially went to AA five nights a week. He cut back but could spend up, to four nights a week at AA which meant he was out of the house for up to fifty eight hours per week. This summer he was still involved with AA three or five times a week. Meetings initially ended about 9:00-9:30 but later about 10:30-11 pm. While the family was delighted with the sobriety, the difficulty was the loss of family time. While alcoholism may be a family problem, this family was unable to resolve the problem. CT Page 4944
In 1987 the defendant became romantically involved with a client of The Samaritans, Inc., a serious breach of service rules. Both parties resigned from the agency. Without the approval of wife or child, the defendant left the marital home in June 1988. About that time the plaintiff was diagnosed as having a sexually transmitted infection; both parties received medical attention, although the plaintiff insisted he had no symptoms. For a lengthy period prior to these hearings, there was no significant communication between the parties. On balance the servant appears to have in more at fault for the failure of this marriage which held such happy prospects. Exhibit 38
Elizabeth is a fifteen year old girl who is busy with school, baby sitting and horses. She spends three hours a day riding and attends horseshows on weekends. She has been advanced $4500 from a trust in order to purchase a horse. To improve her chances of competing in the National Horse Show before she no longer qualifies at 18, Elizabeth now needs to buy or lease a top rank horse. The cost runs between $18,000 to $100,000. Plaintiff described his daughter's equestrian activity as a rich man's hobby.
Elizabeth wishes to become a veterinarian and has champion riding potential. The life style of the parties prior to the separation has been quite comfortable. The defendant paid about $2,000 per year for a Fishing and Game Club. The parties took expensive vacations. The plaintiff had domestic help. There appeared to be no financial pressure.
Father and daughter have disagreed on issues and she still has residual anger at his separation from the family. While Elizabeth has concerned with a therapist, she is not in counselling. Plaintiff would not object to counselling, if appropriate.
 II.
In December 1972, the defendant purchased the marital home; the plaintiff contributed a New thousand dollars.
Defendant's father died in 1975. The defendant's stock portfolio reflects a bequest of stock in 1976/1977 with subsequent transactions. This case was reopened for submission of a current financial affidavit reflecting the present depressed stock market.
Defendant's late mother set up two trusts in August 1975. The trustee in each instrument is an independent bank. Both trusts are Spendthrift Trusts, 52-321. CT Page 4945
The trust referred to as the Timothy Trust was funded in 1985. The trust estate was divided into four portions for the defendant and his three brothers. The trustee in its discretion can pay out so much of annual net income or principal for most comfortable care, maintenance and support of defendant. Thereafter, the trustee can distribute to the defendant's three sons and Elizabeth, not necessarily equally, the balance of the annual net income or principal for their comfortable maintenance, support and education. The trustee is requested to be generous for the defendant and to consider activities commonly engaged in by persons of comparable financial resources. The defendant in his sold discretion is empowered to appoint all or any part of the principal, in trust or otherwise, to a person, except himself. If this power is not exercised by defendant in his lifetime or by will, the principal would be divided equally among his four children, including Elizabeth. Exhibit W-1.
The second trust referred to as the Paula trust was funded in 1975. (Paula and the plaintiff are the same person). At the same time equivalent amounts were gifted to the defendant's brothers, but only the defendant's allocation was placed in trust. During the "initial period" of the trust, the trustee in its discretion can pay out annual net income or principal for the benefit of plaintiff so long as she shall be married to defendant whose children were the secondary beneficiary; if the marriage terminates, the trust by trustee then becomes available for the defendant's three sons and Elizabeth, not necessarily equally; and the defendant in his sole discretion is empowered to appoint all or any part of the trust principal for the benefit of plaintiff or any of his three sons and Elizabeth. Exhibit W.2. The initial period is still in effect.
But under the Paula trust, paragraph eleven, the filing of this divorce action in 1988 constituted the termination of the marriage and plaintiff's status as a "beneficiary." She then lost her income from the trust. He still retains his ability to set the principal of the Paula trust to his four children, but he then lost his limited power of appointment to her as a "beneficiary."
The donor's primary motivation for the terms of the Paula trust may have been to protect the defendant from claims by his first wife against an outright gift. However, the donor also protected her son against marital claims by his present wife at least during the "initial period." (After the "initial period" the trust could be distributed out right free of trust conditions to the defendant, if living, where it might have CT Page 4946 been considered a marital asset in a subsequent dissolution action between the current parties.) The Paula trust was shown to plaintiff before execution. Plaintiff was hurt by the provisions analogous to a prenuptial agreement. Nevertheless the trust consisted of the donor's own funds; she had absolute control over how she would distribute.
Apart from the futility of ordering the defendant to appoint the trust principal of the Paula trust to her, the blunt thrust of the trust was to exclude the plaintiff from any trust benefit upon divorce. The termination provisions do not necessarily benefit the defendant; the court can neither speculate on the contingencies in the trust, nor rewrite the trust.
The trustee is not a party to this dissolution action. Gaudio v. Gaudio et al, 23 Conn. App. 287, ___, ___ A.2d (1990). There was, however, considerable testimony on the status of the two trusts. See Exhibit 24.
The appreciation of the Timothy trust from 1985 to February 1990 was $226,444, with a February 1990 value of $450,270 at 3.3% return. The appreciation of the Paula trust from 1975 to April 1990 was $667,848, with a April 1990 value of $947,454 at 4.06% return.
While the court does not assign any of the principal of the Paula trust, that trust can provide income for Elizabeth. Even if this court has no power over the trustee, the trustee has distributed funds, subject to income taxes, to her to pay her Kingswood tuition and should continue to do so. The trustee has declined to finance the purchase of the replacement horse. Now that the plaintiff is no longer the primary beneficiary of the Paula Trust, Elizabeth shares the benefits with tuition and $750 month allowance, but in early 1990 this trust had accumulated about $26,000 in unexpended income and the trusts totaled about $1,398,000. Even with a depressed stock market and the current low return of 4.06%, the parties might review Elizabeth's horse request for current feasibility. Presumably the horse would be sold after final competition. The court also recognizes the continuing expense of maintaining the horse; in that regard, the court is not clear as to the nature of the $7,000 debt listed on plaintiff's financial affidavit; if that amount is an advance, presumably it need not be repaid to the trust. The court leaves the whole issue of the horse to the family and bank.
On the other hand, the Timothy Trust does not exclude plaintiff as a possible beneficiary of the power of appointment. She is not a creditor. The plaintiff should CT Page 4947 share in the appreciation of the trust principal, that is fifty percent of the difference between funding value of $223,826 and value as of market at close of business December 7, 1990. The trustee should be able to provide such information without difficulty. It may be that the appreciation on December 7, 1990 is less than on February 8, 1990.
The parties are in dispute over the contents of the marital home. Some items were purchased by plaintiff pre-marriage; others were purchased during the marriage; much, however, came from the estate of defendant's mother in 1985 as replacement for the furnishings already in the home. The defendant removed some items from the house when he left. Remaining for allocation by the court are three lists totaling 201 items plus 666 books.
Any asset that carried the Cooley brand does not automatically revert back to the defendant. The source of the property is one factor among several which in this case includes the defendant's alcoholism and the plaintiff's responsibility for defendant's sons. Section 46b-81(c). Over the course of events of time, an asset derived through one party can be transformed into a joint marital asset. The allocation of assets in a dissolution action need not be equal, nor is an allocation limited to use of only marital assets.
In connection with the initiation of this action, on September 1, 1988 the court restrained the defendant from dealing with the stock portfolio, except he might liquidate securities and utilize deposits up to an amount not to exceed $100,000. A purpose of the order was to preserve marital assets yet enable compliance with pendente lite orders. Motion 102. (On that date he showed savings of $34,000 and stock of $235,300-). The order was modified to allow further reductions. His current affidavit shows deposits of $600- and stock of $45,500.
In defendants' proposed settlement he would agree to provide some post-majority support and all costs relating to private school and college education, under certain conditions. Because of the presence of the trust, his offer is not clear.
However, the court cannot order these post-majority provisions because they are not an agreement in writing submitted by the parties. Section 46b-66.
This family and the trusts are particularly sensitive to the current investment market. There is some doubt in the court's mind whether the parties can continue in their present employment or what their practical alternative opportunities CT Page 4948 might be. At the present time, it appears doubtful that either party will earn more than $25,000 in 1990. Without both trusts and the family income, the parties may not be able to maintain a pre-dissolution standard of living. The Paula trust has been shifted to the children. The investment goals of both trusts still focus on growth which may require the sale of stock for liquidity at the cost of future income. (Perhaps the investment goals of these trusts might be reconsidered). Nevertheless, the defendant can depend on the Timothy Trust for immediate support and can rely on the Paula Trust to provide support for Elizabeth, apart from the possibility of receipt outright of the trust corpus. The defendant also may have, albeit indirectly, some access to the corpus of his trust.
 III.
After considering the evidence, argument and the statutory mandates, including 46b-56, 46b-56a, 46b-62,46b-81, 46b-82 and 46b-84, the court dissolves the marriage and makes the following orders:
1. The plaintiff shall be sole custodian of the minor child. However, each parent should maintain a full and active role in providing an appropriate environment for the child. The parents should consult with each other and join in major decisions to be made with regard to the child's general welfare, including education, recreation and health. The parents shall also inform each other of any illness, accident or other circumstances seriously affecting the health or welfare of the child. Each parent shall furnish the other copies of any reports from third persons concerning the health, education or welfare of the child. The parents shall exert every reasonable effort to maintain free access and unhampered contact between the child and the parents shall do nothing which may estrange the child from a parent or injure the opinion of the child as to her mother or father, or act in such a way as to hamper the free and natural development of the child's parental love and respect.
The father shall have liberal parenting time with the child.
2. Plaintiff shall provide health insurance for the benefit of the minor child as currently available to the plaintiff through employment, subject to 46b-84c. If not paid by the trustee any unreimbursed expenses shall be shared equally by the parties, except orthodontic expenses which shall be paid by defendant. CT Page 4949
3. The defendant shall pay $250 per week as support for the minor child. The parties shall alternate the IRS exemption with the defendant claiming for tax year 1990.
4. The parties shall each designate their minor child as the sole beneficiary of their current life insurance policies and shall not further borrow from or pledge said policies.
5. The defendant shall quitclaim all his interest and title in 16 Penwood Road, Bloomfield, Connecticut to the plaintiff subject only to the present first mortgage.
6. The division of personal property (Exhibit 26): a. All personal property removed by the defendant shall be his sole property. Exhibit 31. (To extent there is any inconsistency with other property orders, Exhibit 31 governs; the parties did not correlate the lists, and there may be items not on the lists).
b. Personal property in home shall be sole property of the plaintiff, except Items 1, 3, 4, 7, 8, 11, 12, 18, 20, 21,23-25, 29-31, 38a, 42, 48, 51, 53, 54, 59, 64-68, 70, 113, 114, 119, 123-139, 145-148, 156, 157, 159, 160, 174-188, 191, 192-194, 197, 198, 201.
c. The 666 books shall be sole property of the de defendant with the hope the family can agree on some books to remain in the home, particularly for reading enjoyment.
d. Miscellaneous. One $20 goldpiece to plaintiff (for Elizabeth). Sports equipment to defendant except two fishing rods and one 20 gauge semiautomatic shotgun to plaintiff. Vanity plate, models with equipment, coin collection, Yale campus pictures and oyster cracker picture to defendant.
e. Sterling and flatware; Items 71-111. All items to be the sole property of the defendant except 78, 104 and 107 (the latter two items should eventually go to Elizabeth). The defendant may make further division.
f. A copy of Exhibits 26 and 31 have been retained in file.
7. All stock now in the possession of the defendant shall be his sole property.
8. All IRAs, pension plans, bank accounts, cash surrender value and vehicles as listed on the financial affidavits of the parties shall be the sole property of the listing party. CT Page 4950
9. The defendant shall appoint to plaintiff one-half of the appreciation of the Timothy Trust, Exhibit 1, as calculated herein, pursuant to Article III(b).
10. Any income tax credits or refunds shall be sole property of defendant.
11. The defendant shall pay alimony to the plaintiff as follows: $15,000 within 60 days and $10,000 on the same date of each succeeding year for three years (total four years) and then $1 per year alimony to plaintiff until December 31, 1996; the duration of said alimony is not modifiable.
12. The defendant shall within six months pay to the attorneys for plaintiff reasonable attorney's fees in the amount of $11,500.
SAMUEL S. GOLDSTEIN, J.